IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| NICOLE M.,[1] | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 7:22-CV-600 |
| | ) | |
| v. | ) | |
| | ) | REPORT & RECOMMENDATION |
| MARTIN O'MALLEY,[2] | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | By: C. Kailani Memmer |
| | ) | United States Magistrate Judge |
| Defendant. | ) | |

Plaintiff Nicole M. ("Nicole") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") finding her not disabled and therefore ineligible for disability insurance benefits ("DIB") under the Social Security Act ("Act"). 42 U.S.C. §§ 401–433. Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition. Neither party has requested oral argument; therefore, this case is ripe for decision.

Having considered the administrative record, the parties' filings, and the applicable law, I find that the Commissioner's decision is supported by substantial evidence. Accordingly, and for the reasons detailed below, I respectfully recommend that the presiding District Judge **GRANT** the Commissioner's Motion for Summary Judgment, ECF No. 23; **DENY** Nicole's Motion for

---

[1] Due to privacy concerns, I use only the first name and last initial of the claimant in social security opinions.
[2] Martin O'Malley became the Commissioner of Social Security on December 20, 2023. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Martin O'Malley should be substituted for Kilolo Kijakazi as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

Summary Judgment, ECF No. 18; **AFFIRM** the Commissioner's final decision denying Nicole's DIB claim; and **DISMISS** this case from the Court's active docket.

## STANDARD OF REVIEW

The court limits its review to a determination of whether substantial evidence exists to support the Commissioner's conclusion that Nicole failed to demonstrate that she was disabled under the Act.[3] *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations and alterations omitted); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (emphasizing that the standard for substantial evidence "is not high"). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Mastro*, 270 F.3d at 176 (quoting *Craig v. Chater*, 76 F.3d at 589). Nevertheless, the court "must not abdicate [its] traditional functions," and it "cannot escape [its] duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. *Hays v. Sullivan*, 907 F. 2d 1453, 1456 (4th Cir. 1990).

---

[3] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period for not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work; instead, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience. *See* 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

In contrast, remand is appropriate if the ALJ's analysis is so deficient that it "frustrate[s]" meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (noting that "remand is necessary" where the court is "left to guess [at] how the ALJ arrived at his conclusions"). The ALJ must sufficiently articulate his findings such that the district court can undertake meaningful review. *See Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016).

## CLAIM HISTORY

Nicole filed for Title II DIB on September 21, 2020, claiming that her disability began on January 30, 2020. R. 20, 75, 157, 200. Nicole's date last insured is March 31, 2025. R. 20. Nicole's claims were denied by the Commissioner at the initial and reconsideration level of administrative review. R. 74, 84. On January 6, 2022, ALJ Jeffrey Schueler held an administrative hearing to consider Nicole's claims. R. 41–73. Counsel represented Nicole at the hearing, which included testimony from Nicole and vocational expert Dominique Warner. *Id*. On March 23, 2022, the ALJ entered a decision analyzing Nicole's claims under the familiar five-step process[4] and denying her request for benefits. R. 18–35.

The ALJ determined that Nicole met the insured status requirements of the Social Security Act through March 31, 2025. R. 20. At the first step, the ALJ found that Nicole had not engaged in substantial gainful activity since January 30, 2020, the alleged onset date. *Id*. At the second step,

---

[4] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform other work. *Johnson v. Barnhart*, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R.§ 404.1520); *Heckler v. Campbell,* 461 U.S. 458, 460-62, 103 S. Ct. 1952, 76 L. Ed. 2d 66 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. At the fifth step, the burden shifts to the Commissioner to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); *Taylor v. Weinberger*, 512 F.2d 664, 666 (4th Cir. 1975).

the ALJ found that Nicole has the following severe impairments: cervical spine osteoarthritis, shoulder arthropathy, major depressive disorder, generalized anxiety disorder, obsessive-compulsive disorder, agoraphobia, obstructive sleep apnea/insomnia, obesity, and hypertension. R. 21. As to the third step, the ALJ found that Nicole's impairments, either individually or in combination, did not meet or equal a listed impairment. R. 21–24. Regarding Nicole's mental impairments, the ALJ found that Nicole had mild restrictions in understanding, remembering, and applying information; moderate limitation in social functioning; moderate limitation in maintaining concentration, persistence, or pace; and a moderate limitation in adapting and managing herself. R. 23–24.

The ALJ determined that Nicole retained the residual functional capacity ("RFC") to perform medium work except she can occasionally push or pull; never climb ladders, ropes, or scaffolds; and frequently climb ramps or stairs, balance, stop, kneel, crouch, or crawl. R. 25. The ALJ also found that Nicole needs a work environment free of fast-paced production requirements such as assembly-line work (where the work of others would be dependent on Nicole's actions), involving only simple, work-related decisions, few if any workplace changes, no interaction with the public, and occasional interaction with coworkers. *Id*.

At the fourth step, the ALJ determined that Nicole could not perform her past relevant work as a cashier, a customer service representative for the Military Order of the Purple Heart, a salesperson, or a restaurant server who managed the front end. R. 32–33. However, at the fifth step, the ALJ found that Nicole could perform jobs that exist in significant numbers in the national economy, such as automobile detailer, order caller, and office helper. R. 33–35.  Thus, the ALJ concluded a finding of "not disabled" was appropriate. R. 35. Nicole appealed the ALJ's decision,

and on September 28, 2022, the Appeals Council denied her request for review. R. 1–6. This appeal

followed.

## FACTS

Nicole was born on August 22, 1974, which classifies her as a "younger person" under 20

C.F.R. §§ 404.1563(c), 416.963(c). R. 33. She has a GED certificate which equates to a high school

education, and previously worked in retail sales, customer service, and food service. R 46–48.

In rendering his decision, the ALJ reviewed medical records from New Horizons Health

Care ("New Horizons"), Blue Ridge Behavioral Healthcare ("BRBH"), Carilion Pulmonary and

Sleep Medicine, Carilion Clinic, Lewis Gale Medical Center, Insight Imaging and Med Express

Urgent Care. *See* R. 262–577.

### I.    Medical Treatment

On May 25, 2017, Nicole saw Ruthie Peevey (NP Peevey), a family nurse practitioner, at

New Horizons for a follow-up visit. R. 370. Nicole received a depression screening (PHQ-9)[5] for

which she received a total score of zero identifying that she did "not at all" experience any of the

questioned symptoms of depression. *Id*. Nicole's general appearance was noted as well developed

and well-nourished. R. 371. NP Peevey's medical assessment consisted of depression, obesity,

insomnia, and hypertension, and Nicole was continued on Zoloft for depression, Ambien for

insomnia, and started on Contrave to assist with weight loss. R. 371–372.

---

[5] The PHQ-9 screening for depression involves the following inquiries: Little interest or pleasure in doing things; feeling down, depressed or hopeless; trouble falling or staying asleep, or sleeping too much; feeling tired or having little energy; poor appetite or overeating; feeling bad about yourself or that you are a failure; trouble concentrating on things, such as reading the newspaper; moving or speaking so slowly [than] other people could; thoughts you would be better off dead, or of hurting yourself. *See* R. 370. PHQ-9 scores range from no depression (score of 0) to severe depression (score of 20 – 27). R. 325, 336, 351, 353, 359, 370, 470, 520, 532, 536.

On September 8, 2017, Nicole saw NP Peevey for a medication refill. R. 367–69. Nicole reported she wanted to change her Contrave prescription back to Wellbutrin. NP Peevey's assessment included obesity, hypertension, anxiety, insomnia and tobacco disorder, and prescribed Wellbutrin for anxiety and renewed Nicole's prescriptions for Zoloft and Ambien to treat her anxiety and insomnia. R. 368–69.

On December 20, 2017, Nicole presented to VelocityCare Electric with complaint of back pain and left-sided flank pain that had persisted for three days. R. 269. Nicole was diagnosed with flank pain and acute low back pain without sciatica and was given a Toradol injection and prescribed Norco and Flomax for what was thought to be a kidney stone. R. 272.

On January 11, 2018, Nicole saw NP Peevey for a follow-up visit and medication refill. R. 364–66. Nicole's blood pressure was a bit elevated and she was told to monitor and schedule a check-up in four weeks to determine if medication was necessary. *Id*. Nicole reported that her depression was "currently well controlled," and she received a refill for Zoloft and Wellbutrin, as well as Ambien for her insomnia. R. 365. On February 19, 2018, Nicole reported for her follow-up appointment for a review of her blood pressure log over the past month. R. 362. Nicole was prescribed Lisinopril for hypertension, encouraged to work on diet and exercise, and told to come back for a follow-up appointment in four weeks. R. 363.

On March 28, 2018, Nicole saw NP Peevey for a pap smear. R. 359–61. Nicole received a depression screening (PHQ-9) for which she received a total score of zero identifying that she did "not at all" experience any of the questioned symptoms of depression. *Id*. Nicole reported that her depression was "currently well controlled" and NP Peevey continued her current medication regimen. R. 360. As to Nicole's hypertension, NP Peevey noted her blood pressure was well controlled, and she recommended Nicole continue her current medication regimen. *Id*.

On June 7, 2018, Nicole saw NP Peevey for a follow-up visit reporting she was experiencing a cough for over a month and was concerned it was caused by Lisinopril that was prescribed to her at her February 19, 2018 appointment for hypertension. R. 356. NP Peevey noted that her cough did not sound dry enough to be related to her Lisinopril but would reconsider if her symptoms persisted. R. 357. Nicole's blood pressure was adequately controlled, and she was continued on Lisinopril for hypertension. *Id*. At this appointment, NP Peevey noted that Nicole had impaired fasting glucose and she discussed with Nicole a diagnosis of prediabetes and the importance of a low carb diet and exercise. *Id*.

On October 25, 2018, Nicole saw NP Peevey for a follow-up visit and reported worsening depression and anxiety since the spring, claiming she lost her job in June due to trouble leaving her house. R. 353. She received a score of 22 on the PHQ-9 depression screening which is interpreted to be consistent with severe depression. *Id*. Nicole reported she no longer felt Zoloft was helping her depression. *Id*. Her medical assessment was hypertension, anxiety, and depression, and NP Peevey was discontinued Zoloft and started on Lexapro, prescribed Gabapentin for anxiety, and was referred for counseling. R. 354. At a follow-up visit for depression on November 8, 2018, Nicole received a score of 13 on the PHQ-9 depression screening which is interpreted to be consistent with moderate depression. Nicole noted that she noticed a slight improvement in her depression since starting Lexapro,but had not noticed much change in her anxiety with Gabapentin. R. 351. NP Peevey increased Nicole's dosage of Lexapro and referred Nicole to a psychiatrist, noting that there was minimal improvement in her depression and anxiety with her current regimen. *Id*.

On February 22, 2019, Nicole saw Jordan White ("NP White"), family nurse practitioner, for a follow-up visit, medication refill, and to discuss increasing her Lexapro. Nicole reported that

her depression had "heightened a bit" since her last visit, she remained anxious, and had more sad days than happy. R. 349. Nicole's primary diagnosis was depression, although she continued to have a diagnosis of anxiety and hypertension. R. 350. Nicole was continued on Ambien and prescribed Seroquel for her depression. *Id*. Nicole also complained of snoring and was referred to a pulmonologist for a sleep study. *Id*.

On April 11, 2019, Nicole saw NP White for a follow-up visit. R. 346. Nicole reported that she was facing worsening anxiety and crying frequently at her last visit, but she claimed her new prescription of Seroquel "entirely resolved her symptoms." *Id.* Nicole reported she was still easily aroused from sleep and was awaiting a sleep study. *Id*.

On July 12, 2019, Nicole saw NP White for a three-month follow-up visit and medication check. R. 342. Nicole reported that her combination of Lexapro, Seroquel, and Wellbutrin was working "very well" for her and that she only took Ambien one time during the past few months to help with sleep. *Id*. Nicole was continued on the same medications and was advised to set a follow-up appointment in six months. R. 343.

On August 22, 2019, Nicole saw Bruce N. Stewart, MD for complaints related to feeling "tired and sleepy much of the time" and claiming she could doze off "quite easily" when she sits quietly. R. 314. Dr. Stewart noted Nicole was diagnosed with obstructive sleep apnea in 2009. *Id*. Nicole was titrated with a continuous positive airway pressure machine ("CPAP"), but she claimed to feel claustrophobic with the full facemask and stopped using the CPAP after a short time. *Id*. Dr. Stewart's examination concluded with diagnoses of obstructive sleep apnea, hypersomnia, hypertension, class 2 severe obesity due to excess calories with serious comorbidity, depression, mild intermittent asthma, and chronic insomnia. R. 317. Nicole was scheduled for a home sleep

study to determine how much sleep apnea was present at that time and Dr. Stewart noted it "was really quite mild before." R. 318.

A Home Sleep Apnea Test was conducted on October 8, 2019. The sleep study's results concluded Nicole had severe obstructive sleep apnea syndrome and it was recommended that Nicole try CPAP again with a smaller nasal device. R. 292–94. On February 6, 2020, Nicole saw Dr. Stewart to follow up on her diagnosis of obstructive sleep apnea. R. 289. The CPAP report reflected that over the past 30 days her usage was 87% but the compliance for four hours was only 53%. *Id*. Nicole was advised to increase her compliance to at least 70% and schedule a follow-up appointment in six months. R. 292.

On February 27, 2020, Nicole saw Carl Saunders ("NP Saunders"), family nurse practitioner, with New Horizons to fill out FMLA paperwork for anxiety and depression. R. 336. Nicole received a score of 21 on the PHQ-9 depression screening which is interpreted to be consistent with severe depression. *Id*. Nicole reported she was experiencing anxiety and depression during the prior four-week period and was "feeling down and anxious most days of the week." *Id*. NP Saunders explained that he did not feel comfortable filling out Nicole's FMLA paperwork due the lack of consistent follow-up with a primary care physician and that she was not seen during the month-long period of anxiety. R. 338. Nicole was provided a plan to become established with a behavioral health provider and counselor. *Id*.

On April 14, 2020, Nicole saw Sabrina Royall ("NP Royall"), family nurse practitioner, with New Horizons for refills of her medications and to establish a primary care physician. R. 330. Nicole received a score of 18 on the PHQ-9 depression screening which is interpreted to be consistent with moderately severe depression. *Id*. Nicole reported a history of insomnia, anxiety and depression and noted she has referrals for psychiatry and behavioral health. *Id*. Nicole noted

her anxiety and depression is "controlled currently" but she would still like to see behavioral health. *Id*. She also reported she was sleeping 6 to 8 hours at night. *Id*. Nicole was continued on Lisinopril, Ambien, Wellbutrin, and Lexapro and advised to return in three months. R. 331–32.

On July 14, 2020, Nicole had a follow-up visit with NP Royall for her medication and complained of worsening right shoulder pain that had persisted for six weeks. R. 325. Nicole received a score of 21 on the PHQ-9 depression screening which is interpreted to be consistent with severe depression. *Id*. Nicole had tenderness over the right acromioclavicular joint, but had full range of motion of the right shoulder with intact strength and no pain, welling, or redness. R. 32627. Nicole was continued on Wellbutrin, Lexapro, and Seroquel for depression and anxiety, Lisinopril for hypertension, Atorvastatin for hyperlipidemia, and was referred for X-rays of her right shoulder. R. 327.

On July 27, 2020, Nicole received an X-ray for her right shoulder. R. 402, 412. Nicole reported AC joint pain and that she experienced a constant throb to her anterior shoulder at the acromioclavicular joint. *Id*. Dr. O'Brien noted osteoarthritic changes and that the clavicle appeared slightly high in position relative to the apical acromion and a mild spurring from the distal clavicle but did not appreciate any acute bony process significant malalignment. *Id*. The treatment suggested was activity modification, rest, ice, and use of NSAIDS, and a possible steroid injection if desired by Nicole. R. 327.

On August 7, 2020, Nicole saw Jennifer Oginz, a licensed professional counsler, at New Horizons for a diagnostic psychiatric evaluation. R. 423. Oginz's treatment notes reflect Nicole has a history of bipolar II disorder and anxiety with obsessive-compulsive and agoraphobic traits, and has been in counseling off and on for a significant part of her life. R. 423. Oginz assessed Nicole to have anxiety and depression scheduled a follow-up visit in two weeks. *Id*. Nicole had

three follow-up appointments with Oginz on September 3, 2020, October 12, 2020, and October 28, 2020. Nicole reported to Oginz that she "sees herself as agoraphobic and also having social anxiety, more agoraphobia than social." Nicole further claimed "[s]he can go out as long as someone she knows well is with her. She won't go alone or not often." R. 417–22.

On October 15, 2020, Nicole had a telehealth appointment with NP Royall for a medication check. R. 333. Nicole received a score of 21 on the PHQ-9 depression screening which is interpreted to be consistent with severe depression. *Id*. Nicole reported her anxiety and depression were "about the same" and "improving" and she was going to counseling bi-monthly at New Horizons. R. 333–34. During the psychological examination, Nicole appeared oriented to person, place, time/date, and situation; made eye contact; able to concentrate and stayed focused on the encounter; and her affect was appropriate for the visit. R. 334. Nicole was continued on Wellbutrin, Lexapro, Seroquel, and Lisinopril, ceased Ambien, and advised to follow up in three months. R. 334–35.

On December 3, 2020, Nicole had a telehealth psychotherapy session with Jennifer Oginz. R. 435. Nicole reported half the time she did not want to live but denied suicidal ideations. *Id*. Oginz's medical assessment included major depressive disorder, recurrent episode, moderate; social anxiety disorder; and generalized anxiety disorder. *Id*. Nicole met with Oginz on January 8, 2021 and January 25, 2021. R. 433, 459. Nicole reported that she was "at baseline level anxiety" and that she will "be okay for a while, and it just comes back." R. 459. Nicole further advised Oginz that she recently threw up on her way to have dinner with her son at his home due to her anxiety. *Id*.

On April 6, 2021, Nicole met with NP Royall, her primary care physician, for a medication refill. R. 470. Nicole received a score of 21 on the PHQ-9 depression screening which is interpreted

to be consistent with severe depression. *Id*. Nicole reported her anxiety and depression was "about the same," that she was seeing Jennifer Oginz for counseling at New Horizon but was not seeing her as of late and requested to proceed with psychological treatment through New Horizon. R. 471. NP Royall renewed Nicole's prescriptions for Wellbutrin, Lexapro, and Seroquel and referred her for psychiatric evaluation. *Id*.

At the April 6, 2021 appointment with NP Royall, Nicole also reported she was experiencing right shoulder pain for the past month. *Id*. She claimed her shoulder hurt daily and she was starting to have occasional paraesthesias of her fingers. *Id*. During her shoulder examination, NP Royall noted there was AC joint tenderness, but Nicole had a full range of motion without pain. R. 473. NP Royall reviewed Nicole's X-ray results and noted Nicole experienced osteoarthritis of the right shoulder. R. 474. Nicole reported she was not taking NSAIDS as prescribed claiming she did not believe they were working. *Id*. NP Royall referred Nicole to David Donahue ("NP Donahue"), family nurse practitioner, at New Horizons for a shoulder injection. *Id*.

On April 12, 2021, Nicole saw NP Donahue for her right shoulder pain and a "clicking sound" with movement. R. 468. Upon examination, NP Donahue noted Nicole had full range of motion of her right shoulder with a click, pain with palpitation of the shoulder, 5/5 strength, negative liftoff and drop-arm tests, but tenderness of the AC joint. *Id*. Nicole received a steroid injection and was advised to refrain from lifting, pulling, and tugging for one week. R. 468–69.

On May 10, 2021, Nicole had her first visit with Renee Nauful ("NP Nauful"), a psychiatric mental health nurse practitioner, at New Horizons, for an evaluation of her anxiety and depression. R. 536. Nicole was initially scheduled to see NP Nauful on April 20, 2021, but had to reschedule due to transportation issues. *Id*. Nicole received a score of 24 on the PHQ-9 depression screening which is interpreted to be consistent with severe depression, and a score of 21 on the GAD-7

anxiety screening which is interpreted to be consistent with severe anxiety. *Id*. During her examination, NP Nauful noted Nicole was anxious but her mood was appropriate, and that she warmed up well and became increasingly forthcoming as she became more comfortable. R. 539. NP Nauful questioned why Nicole quit attending mental health counseling and reinforced its importance as "first line treatment," to which Nicole responded that she was not interested in attending at that time. R. 540. NP Nauful's medical assessment was generalized anxiety disorder, moderate recurrent major depressive disorder, and insomnia. *Id*. Nicole was advised to continue Lexapro and Ambien, stop Seroquel, start Topamax and increase her dosage of Wellbutrin. *Id*.

On June 8, 2021, Nicole attended a follow-up appointment with NP Nauful. R. 532. Nicole reported there had been no change in her condition since her previous visit where she rated her anxiety and depression as 10/10. *Id*. Nicole received a score of 27 on the PHQ-9 depression screening which is interpreted to be consistent with severe depression. *Id*. Nicole reported she stopped taking Topamax because she broke out in a rash. *Id*. NP Nauful's examination noted Nicole's mood was not tearful, but still depressed and her affect was depressed/sad. R. 534. Nicole's medications were adjusted and she was advised to return for a follow-up visit in three weeks. R. 535.

On June 17, 2021, Nicole saw Dr. Stewart with a chief complaint of "feel[ing] tired much of the time" despite the ongoing use of her CPAP machine. R. 489. Nicole's CPAP report showed usage of 83% and compliance of 63% over the past 30 days and an average usage of 6 hours and 21 minutes on the days she used the machine. *Id*. Dr. Stewart recommended Nicole use her CPAP more and that there were "many nights that she skips using it altogether." R. 494. During her examination, Nicole also reported she was experiencing "rather severe" anxiety and depression. R. 493. Upon review of Nicole's systems, Dr. Stewart noted she was positive for malaise/fatigue

and depression and experienced nervousness, anxiety, and insomnia. *Id*. Nicole's diagnoses included obstructive sleep apnea, nicotine dependence, chronic insomnia, hypertension (benign), class 2 severe obesity with severe comorbidity, hypersomnia, and major depressive disorder. R. 494.

On July 7, 2021, Nicole was evaluated for left arm pain from the shoulder to the elbow. R. 506. She was sent to the emergency department to rule out a blood clot. R. 506–13. Nicole's examination showed tenderness to palpitation over the left anterior shoulder, a full range of motion and no tenderness to the neck, and neurovascularly intact throughout her arms. *Id*. The results of imaging showed no definite findings to explain the left shoulder symptoms. *Id*. The pain was reproducible with palpitation of the shoulder and thoracic back, but the additional diagnostic workup was unremarkable. *Id*. Nicole was prescribed anti-inflammatories and muscle relaxers and discharged in stable condition. *Id.*

On August 12, 2021, Nicole saw NP Nauful for a follow-up visit. R. 527. Nicole reported she was "feeling worse" and "feel[ing] angry a lot more." R. 527–28. Nicole received a score of 21 on the PHQ-9 depression screening which is interpreted to be consistent with severe depression, and a score of 18 on the GAD-7 anxiety screening which is interpreted to be consistent with severe anxiety. R. 527. Nicole reported that she was sleeping better and getting 6 to 7 hours of sleep per night. *Id*. Nicole further reported that she was experiencing uncontrollable crying with no cause, poor hygiene, impaired focus and concentration, and both visual and auditory hallucinations. R. 527–28. Upon examination, Nicole's mood was noted as occasionally tearful and her affect was depressed/sad but appropriate with mood. R. 530. Nicole's appearance was alert, neat, clean, and nicely dressed, and her behavior was friendly, cooperative, and engaging. *Id*. Her stream of thought was logical, her memory was intact, and she had no auditory or visual hallucinations. *Id*. Nicole's

diagnoses were unchanged, and NP Nauful adjusted her medications and advised her to return in four weeks. R. 531.

On September 9, 2021, Nicole saw NP Nauful for a behavioral health follow-up visit. R. 523. Nicole reported that she was "doing better" regarding her depression rating it as a 5/10 and averaging 7 hours of sleep per night. *Id*. Nicole also reported she had "a lot more energy," "notice[d] a big difference" since starting Trintellix, and she was "getting stuff done" noting "it's been great." R. 524. As for her anxiety, Nicole reported she felt "about the same" rating it as 9/10. *Id*. Nicole received a score of 19 on the PHQ-9 depression screening which is interpreted to be consistent with moderately severe depression. *Id*. NP Nauful noted Nicole's depression was moderate and improving and that her anxiety was mild and improving. R. 526. Upon examination, Nicole was noted to be in a good mood, with a bright affect and smiling. *Id*. Nicole's medication was adjusted to increase her Trintellix and decrease Wellbutrin, and she was advised to return for a follow-up appointment in four weeks. *Id*.

On October 12, 2021, Nicole attended a telehealth appointment with NP Nauful for medication management and follow-up for her anxiety and depression. R. 520. Nicole reported that she was "not doing too good." *Id*. Nicole reported her anxiety was 10/10 and that was why she could not attend her appointment in person. *Id*. Nicole reported her depression was the same but described her mood as "back to being up and down, and anger too, everything getting on [her] nerves really bad." *Id*. Upon examination, Nicole was noted to be alert, cooperative, and engaging. R. 521. Her mood was "choked up as if to cry" when asked about takeaways from a book she recently read and what she learned, and her affect was depressed/sad. *Id*. NP Nauful noted that the decrease in Wellbutrin may have caused the mood changes and resumed/increased her dosage. R. 521–22.

15

On October 26, 2021, Nicole saw NP Royall for concerns regarding neck and shoulder pain R. 515. Nicole reported that during the past month she experienced worsening paresthesias and tingling in both arms, with the feeling as if her arms are asleep. *Id*. Nicole claimed she experienced headaches, blurred vision, and dizziness intermittently but denied experiencing an injury or fall. *Id*.  Upon examination of Nicole's neck and shoulder, NP Royall noted tenderness in her paraspinal muscles, limited flexion and extension of the neck, tenderness over the trapezius muscles bilaterally. R. 517–18. Nicole had a full range of motion of her shoulders without pain. R. 518. NP Royall's assessment included neck pain, pain in left and right shoulder, other chronic pain, and paresthesias. *Id*. Nicole was referred for an X-ray of the cervical spine. *Id*. Nicole underwent a cervical spine X-ray on October 29, 2021, which revealed moderate multi-level facet osteoarthritis that was noted to be greater on the right than the left. R. 546.

On December 9, 2021, Nicole had a follow-up behavioral health visit with NP Nauful. R. 561–62. NP Nauful noted that Nicole missed her November 23, 2021, and that it was unclear why Nicole can attend appointments with other health care providers in person but has requested telehealth visits with her. R. 561. Nicole reported to staff that the numbness in her hands is too much to leave her house. *Id.* During her appointment, Nicole noted she was experiencing crying spells, mood swings, depression, anxiety, and stressors. R. 562. During examination, NP Nauful noted that Nicole's appearance was alert, but she looked like she had not bathed. Nicole's behavior was cooperative and engaging and her affect was appropriate with mood. R. 562–63. Nicole's medication was adjusted to reduce the dosage of Trintellix, discontinue Ambien in favor of Lunesta, and continued on Wellbutrin. R. 563.

On December 12, 2021, Nicole saw Dr. Stewart noting she continued to be "very sleepy." R. 566–67. Nicole reported her sleepiness "occasionally interfere[s] with [her] driving" and she

will "pull over and rest for a while." R. 570. Upon her review of systems, Dr. Stewart noted Nicole was positive for malaise/fatigue, back pain, joint pain, depression, nervousness, anxiety, and insomnia. *Id*. During her physical examination, Nicole appeared alert and oriented to person, place, and time, and had no signs of mood, thought, or memory difficulty. R. 570–71. Dr. Stewart noted Nicole's diagnoses to include obstructive sleep apnea, chronic insomnia, benign hypertension, hypersomnia, class 2 severe obesity with serious comorbidity, and mild intermittent asthma without complication. *Id*. Dr. Stewart advised Nicole that she would be scheduled for a polysomnogram. R. 571.

During the relevant period, Nicole's medical records described above reflect that she is obese with body mass index values in the 30s.

## II.  Medical Opinions

### A.  Jo McClain, Psy. D.

At the initial stage, on February 4, 2021, Dr. McClain evaluated Nicole's mental residual functional capacity and concluded that Nicole was capable of simple, routine tasks. R. 81. Dr. McClain provided that Nicole was moderately limited in: understanding, remembering, carrying out detailed instructions; maintaining attention and concentration for extended periods; working in coordination with or around others without being distracted; getting along with co-workers without distracting them or showing extreme behaviors; interacting with public; accepting instructions and responding to criticism from supervisors; being aware of normal hazards and taking precautions; and traveling to unfamiliar places or using public transportation. R. 80–81.

Dr. McClain noted that at the majority of Nicole's appointments, her exams showed normal mood and affect, good judgment and insight, and linear thinking, and that her mental status examinations noted she was able to concentrate and stay focused and had an appropriate affect. R.

81. Dr. McClain also noted that Nicole was being seen by a mental health provider and was prescribed medications for her mental health conditions. *Id*.

### B. Joseph Leizer, Ph.D.

On reconsideration, on April 27, 2021, Dr. Leizer largely agreed with Dr. McClain's evaluation of Nicole's mental residual functional capacity and concluded that she remained capable of performing simple, routine tasks. R. 91. Although both Dr. Leizer and Dr. McClain opined that Nicole had a moderate limitation with adaptation, Dr. Leizer opined that Nicole was moderately limited in responding to changes in the work setting, setting realistic goals, and making independent plans, but not limited in her awareness of hazards or ability to travel to unfamiliar places. R. 91.

### C. Renee Nauful, PMHNP

On November 23, 2021, NP Nauful, completed a medical opinion questionnaire form titled, "Medical Opinion Re: Ability To Do Work-Related Activities (Mental)." R. 547–51. NP Nauful opined that Nicole had "marked" limitations in her ability to complete work-related functions for unskilled work, including maintaining attention for two-hour periods, maintaining regular attendance and punctuality, completing a workday and workweek without interruptions from psychological symptoms and without special supervision, performing at a consistent pace, accepting instructions and criticism from supervisors, working with or around others, getting along with co-workers, responding appropriately to changes in the work setting, dealing with stress, and being aware of normal hazards and taking precautions. R. 547–48. She further opined that Nicole had moderate limitations in remembering procedures, understanding remembering and carrying out short and simple instructions, making simple work decisions, and asking simple questions or requesting assistance. *Id*. NP Nauful further provided that Nicole had marked and extreme

limitations in abilities needed for semiskilled or skilled work. R. 549. Regarding abilities needed for certain types of jobs, NP Nauful opined that Nicole had a marked limitation in interacting with the public, maintaining appropriate behavior, neatness, and cleanliness, and traveling to unfamiliar places, and a moderate limitation in using public transportation. *Id*. NP Nauful determined that Nicole would on average be absent from work more than three times a month. R. 550.

In support of her medical opinion, NP Nauful noted that Nicole has an "extensive history of social anxiety including agoraphobia, gets easily distracted, even paranoid." R. 548. She further stated that Nicole "even has difficulty around family gatherings and going in public to grocery stores, etc." *Id*. She also indicated that Nicole struggles to complete activities of daily living due to both depression and chronic pain and she has difficulty going in public which would cause difficulty attending an in-person job. R. 550. At the time, NP Nauful claimed she saw Nicole for office visits "every other month." R. 551.

### D.  Richard Surrusco, M.D.

At the initial stage, on February 4, 2021, Dr. Surrusco found Nicole's essential hypertension is not a severe impairment. R. 78. Overall, Dr. Surrusco explained that Nicole's physical conditions were non-severe and did not interfere with her ability to work. *Id*.

### E.  Jack Hutcheson, M.D.

On reconsideration, on April 28, 2021, Dr. Hutcheson opined that Nicole was capable of medium work, that she could sit, stand, and walk for six hours of the workday and she could occasionally push and pull with her right arm. R. 89.

### III.    Nicole's Testimony

Initially, Nicole alleged disability due to major depressive disorder, dysthymia, anxiety disorder, insomnia, and depression with anxiety. R. 200. In support of her claim for disability, Nicole stated the following:

> I have suffered with severe depression, anxiety and sleep disorders my whole life. I have been in and out of treatment since I was six or seven years old. I started medication for these issues when I was seventeen after already having one suicide attempt. As I have aged these disorders have gotten significantly worse and I have lost my last three jobs due to my excessive absences. I struggle with everyday requirements like taking my medications, eating, showering etc. I have been medicated with numerous drugs and different mixtures of medications and nothing seems to help. I am in complete fear every day and cannot function at a normal level.

R. 212. Nicole further provided that she has trouble keeping up with her hygiene, excessive fear of being outside her home unaccompanied, lacks energy, cannot make decisions, loses her train of thought, has trouble remembering things and staying awake, has panic attacks with nausea, vomiting and diarrhea, has trouble completing what she starts, cannot pay attention for very long or stay on schedule, and has difficulty being around others. R. 224–29.

At the telephonic hearing on January 6, 2022, Nicole testified that she was terminated from her last job due to unexcused absences caused by her anxiety. R. 51. For example, Nicole would get so nervous on her way to work that she would throw up, causing her to be late or miss work. *Id*. On some occasions she would become "terrified" and have to isolate herself at work or leave unannounced. *Id*. Currently, Nicole testified that she continues to experience anxiety and gets really scared and has panic attacks for no reason. R. 54. Her panic attacks make her cry, her heart races, and sometimes she throws up and has diarrhea. *Id*. The panic attacks occur daily, though their frequency varies from two to three times per day to all day. R. 55. When this occurs, Nicole lies down in the dark and isolates from others to try to calm down. *Id.* She avoids leaving her home due to anxiety claiming people are whispering about her, which makes her scared. R. 57. Nicole

testified that she sometimes has issues interacting with her family members. R. 59. She also testified that she cries a lot. *Id*.

Nicole testified that she uses a CPAP machine for sleep apnea but claimed it does "not really" help her sleep, she still wakes up "a bunch," and is "exhausted" the next day. R. 51–52. She sometimes falls asleep when reading, watching TV, or talking to people. R. 52. Nicole testified that she has not been restricted from driving, but she does not drive very much. R. 52, 56.

Nicole testified that she experiences daily pain in her neck and back, and episodes of numbness and tingling in her fingers about twice per day for about an hour. R. 53. She also testified that her right shoulder "locks up" a few times per week which can last all day, and when this occurs, she cannot lift anything or raise the arm above her head. *Id*. She is right-handed. *Id*.

Regarding Nicole's activities of daily living, she testified that she lives with her mom. R. 57. She can make herself toast or a sandwich. *Id*. She attempts to help her mom with chores, such as vacuuming, if her shoulder is not hurting too much or if she does not forget or is in the mood to help. R. 58. She testified that she has difficulty with concentration and focus. *Id*. For example, such used to read all the time but now she has to re-read the same page multiple times. *Id*. She does not attempt to follow recipes due to the same issues. *Id*. Nicole will assist her mom in ordering groceries online, but they do curbside pickup so she does not have to interact with others by going inside to shop. R. 59.

## ANALYSIS

Nicole alleges the Administrative Law Judge ("ALJ") erred in his decision denying her benefits claiming the following assignments of error: (1) the ALJ's analysis of the opinion evidence of Renee Nauful, PMHNP, is not supported by substantial evidence; (2) the ALJ's assessment of Nicole's mental impairments under SSR 96-8p is not supported by substantial

evidence; (3) the ALJ's assessment of Nicole's subjective allegations is not supported by substantial evidence; and (4) the ALJ's assessment of Nicole's physical impairments and RFC findings are not supported by substantial evidence.

## I.   Opinion Evidence of Renee Nauful, PMHNP

Nicole claims the ALJ's analysis of NP Nauful's medical opinion evidence is not supported by substantial evidence. Specifically, Nicole argues that the ALJ failed to appropriately consider the factors under 20 C.F.R. § 404.1520c in that the ALJ failed to consider that NP Nauful has a specialization in mental health impairments and a better understanding of Nicole's impairments than the state agency psychologists as she regularly examined and met with Nicole. Pl.'s Br. 17. Nicole further argues that the ALJ's conclusion that NP Nauful's opinions are not supported or consistent with the evidence of record is not accurate. *Id*. Nicole claims the evidence reflects consistent testing and findings by NP Nauful and other providers that confirms Nicole's severe anxiety and depression as well as her difficulty caring for herself and difficulty leaving her home. *Id*.

The ALJ found that NP Nauful's opinion was not persuasive as her "marked" and "extreme" limitations of Nicole seem to rely heavily on Nicole's self-reported symptoms without addressing her observed mental status during her personal examinations and are, thus, inconsistent with her own treatment notes. R. 31. Further, the ALJ found that NP Nauful's proposed limitations are inconsistent with other evidence in the record. *Id*.

Because Nicole applied for disability benefits on or after March 27, 2017, the ALJ applied the new social security regulations for evaluating medical opinions. *See* R. 30 (citing 20 C.F.R. § 404.1520c). Under the new regulations, the ALJ may not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)." 20 C.F.R. § 404.1520c(a).

Rather, the ALJ must consider the persuasiveness of all medical opinions in the record using five factors: supportability, consistency, relationship with the claimant, specialization, and other factors that tend to support or contradict a medical opinion. *See* 20 C.F.R. § 404.1520c(c).

Although an ALJ may consider all five factors, "the most important factors" are supportability and consistency. 20 C.F.R. § 404.1520c(a), (b)(2). The supportability factor focuses on the information relied upon and explanation provided to endorse the medical source's findings: "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . ., the more persuasive the medical opinions . . . will be." 20 C.F.R. § 404.1520c(c)(1). The consistency factor, on the other hand, compares the source's findings to evidence from other sources: "[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . will be." 20 C.F.R. § 404.1520c(c)(2). The ALJ must explain in his decision how he considered the supportability and consistency factors for each medical opinion in the record. 20 C.F.R. § 404.1520c(b)(2). The ALJ may, but doesn't need to, explain how he considered the other three factors. *Id*.

As always, the ALJ's decision must build an accurate and "logical bridge between the evidence and the ALJ's conclusion that [a medical] opinion," *Oakes v. Kijakazi*, 70 F.4th 207, 214 (4th Cir. 2023), is or is not "persuasive" evidence of the claimant's allegedly disabling medical condition, *see id*. at 212–13. When the court is "'left to guess' as to how the ALJ reached [his] evaluation of the conflicting medical opinions in light of the evidence of record," then it cannot "review the reasonableness of [his] conclusions." *Testamark v. Berryhill*, 736 F. App'x 395, 398 (4th Cir. 2018). This regulation is more flexible than its predecessor, which required ALJs to evaluate "treating source" medical opinions under a special two-part standard and to explicitly

consider each of five regulatory factors when assigning specific weights to every medical opinion in the claimant's record. *See*, *e.g.*, *Dowling v. Comm'r of Soc. Sec.*, 986 F.3d 377, 384–85 (4th Cir. 2021) (citing 20 C.F.R. § 404.1527(c) (2016)).

First, with respect to § 404.1520c(c)'s supportability factor, the ALJ concluded that the "marked" and "extreme" limitations in NP Nauful's medical opinion form seem to rely heavily on Nicole's self-reported symptoms, without addressing that her observed mental status was largely normal, other than her mood and affect during their sessions. R. 31. In support of this conclusion, the ALJ stated that "[t]he suggested rate of absenteeism—more than three times per month—is inconsistent with the routine management of the claimant's mental health conditions in an outpatient setting." *Id*. Beyond discounting the opinion on these grounds, the ALJ also cites to conflicting evidence from NP Nauful's treatment records showing that Nicole exhibited appropriate symptoms during her multiple mental exams and even experienced improvement after a medication adjustment. For example, the ALJ first noted a telehealth session in December 2021 where Nicole's medications were adjusted and she was advised to follow up in four weeks. *Id*. The ALJ also noted in a September 2021 session with NP Nauful that Nicole described recent improvement in her sleep, mood, and energy following an adjustment to her medications. *Id*. The next month, Nicole reported worsening mood and anxiety symptoms, but she showed cooperative and engaging behavior, normal speech rate, logical stream of thought, intact memory, and fair insight and judgment. *Id*.

Second, with respect to § 404.1520c(c)'s consistency factor, the ALJ concluded that NP Nauful's medical opinions conflicted with other medical and non-medical evidence and were, therefore, inconsistent with the record. The ALJ analyzed and assessed the medical opinions of Nicole's other medical providers, her mental status exams at medical encounters during the

relevant period, and Nicole's own statements.  For example, the ALJ considered that another treatment provider declined Nicole's request to fill out FMLA paperwork regarding her anxiety and depression "given the lack of consistent follow-up with a PCP and that she had not been seen during this month long anxiety concern," and at this same appointment Nicole showed normal mood and affect, as well as good judgment and insight. R. 31. The ALJ also pointed to other medical encounters during the relevant period where Nicole was fully oriented, able to concentrate and stay focused, making eye contact, and having appropriate affect. *Id*. The ALJ also considered Nicole's statements in October 2020 where she went several places with her mom and it "was okay," as well as the statement in January 2021 that she enjoyed time with her family during Christmas. *Id*.

Accordingly, based upon the analysis above, the reasons given by the ALJ for finding NP Nauful's opinions unpersuasive are both adequately explained and supported by substantial evidence.

## II.     Plaintiff's Subjective Allegations

Nicole claims that the ALJ improperly discounted her complaints of disabling symptoms. Pl.'s Br. 25–30. Under the regulations implementing the Social Security Act, an ALJ follows a two-step analysis when considering a claimant's subjective statements about impairments and symptoms. Soc. Sec. Ruling 16-3p Titles II & XVI: Evaluation of Symptoms in Disability Claims, SSR 16-3P, 2017 WL 5180304 (S.S.A. Oct. 25, 2017); 20 C.F.R. §§ 404.1529(b)–(c), 416.929(b)–(c). First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms.[6] *Id*. at *3, §§ 404.1529(b), 416.929(b). Second, the ALJ must

---

[6] SSR 16-3p states that a claimant must provide "objective medical evidence from an acceptable medical source to establish the existence of a medically determinable impairment that could reasonably be expected to produce [the] alleged symptoms." *Id*. Objective medical evidence consists of medical signs ("anatomical, physiological, or psychological abnormalities established by medically acceptable clinical diagnostic

evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to work. *Id*. §§ 404.1529(c), 416.929(c). In making that determination, the ALJ must "examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." *Id*.

Contrary to Nicole's argument that the ALJ failed to explain how any of the evidence cited in his opinion undermines Nicole's allegations, the ALJ adequately supported his finding that Nicole's allegations were not entirely consistent with the medical evidence and other evidence in the record. The ALJ acknowledged Nicole's complaints related to her anxiety, depression, and insomnia, including her statements that she experienced anxiety around others, panic attacks with gastrointestinal symptoms, feeling unworthy, decreased motivation, irritability, crying episodes, variable sleep and distractibility. R. 27. However, the ALJ found that these allegations were not entirely consistent with the medical evidence. In support, the ALJ provided multiple examples over the course of her medical visits and treatment:

> Though the claimant's observed mental status has been somewhat abnormal at times, findings have been normal or unremarkable in other areas. For example, a mental status examination in February 2020 showed normal mood and affect, good judgment and insight, and linear thinking, even though the claimant endorsed symptoms consistent with severe depression, and had urine drug screen that was positive for opiates. In July 2020, the claimant was fully oriented and was able to concentrate and stay focused during a mental health encounter. She made eye contact and her affect was appropriate for [the] encounter. Similar findings were noted in October 2020.

techniques") and laboratory findings "shown by the use of medically acceptable laboratory diagnostic techniques." *Id*.

R. 27.  The ALJ continued, emphasizing that later records during 2021 continued to indicate that at appointments where Nicole had mood and anxiety complaints, her mental status examinations remained largely the same.  R. 28.

The ALJ also noted that contrary to Nicole's subjective allegations, her mental health treatment was relatively limited and conservative, consisting of off-and-on outpatient counseling and medication adjustments. *Id*.; *see* 20 C.F.R. §§ 404.1529(c)(3)(iv)-(v); *see also Dunn v. Colvin*, 607 F. App'x 264, 275 (4th Cir. 2015) ("[I]t is well established in this circuit that the ALJ can consider the conservative nature of a claimant's treatment in making a credibility determination . . . .").

The ALJ highlighted that, though Nicole testified that she stopped work in January 2020 due to allegedly severe episodes of anxiety, her primary care doctor noted at a February 2020 visit that he was not comfortable filling out an FMLA form for her "given the lack of consistent follow-up with a PCP and that she had not been seen during [the] month long anxiety concern." *Id*. Further, contrary to Nicole's testimony regarding the severity of her symptoms, she was only seeing NP Nauful approximately a month or less in 2021, and as of December 2021, she had a 20-minute telehealth appointment with NP Nauful which consisted of adjusting her medication and advising Nicole to follow up in four weeks. R. 31. The ALJ further noted periods during her treatment where Nicole exhibited improvements in her sleep, mood, and energy levels. *Id*. Additionally, although Nicole testified that she was unable to focus or concentrate and could no longer read books or even follow a recipe, she reported to NP Nauful at her September 2021 visit that she recently read the book Daring Greatly, and reported one month later she finished another book, Enjoy Every Sandwich. R. 28.

As for Nicole's physical impairments, she testified that she has neck and back issues that cause numbness in her arms daily, and her right shoulder "locks up" a few times a week for "most the day." R. 53–54. The ALJ contrasted Nicole's testimony to the objective medical evidence where her physical examinations repeatedly reflected she had a full range of motion without pain, normal strength in her arms and shoulders, negative liftoff and drop-arms tests, no swelling, and she was neurovascularly intact. R. 29. The ALJ further noted Nicole's X-ray examinations that showed some evidence of osteoarthritis in her cervical spine and right shoulder and very minimal anterolisthesis in her cervical spine, and considered Nicole's conservative treatment, involving only prescriptions for anti-inflammatories and a shoulder injection on one occasion in April 2021. R. 28–29.

As for her obstructive sleep apnea and insomnia, the ALJ acknowledged Nicole's longstanding history of insomnia, which has been treated with medication, as well as her obstructive sleep apnea treated by a CPAP machine. R. 29. The ALJ contrasted Nicole's testimony that she wakes up exhausted despite her use of the CPAP machine with the medical records that reflected Nicole had to be encouraged to use her CPAP more frequently, noting specifically that "[t]here may be many nights she skips using it altogether." *Id*. Further, at a June 2021 medical appointment, Nicole reported that she was using her CPAP machine and was benefiting from its usage. R. 30. Further, despite Nicole's complaints of fatigue and sleepiness, her physical examinations regularly showed her to be alert and oriented, with no signs of mood, thought, or memory difficulty. *Id*.

Nicole points to *Brown v. Comm'r of Soc. Sec.*, 873 F.3d 251 (4th Cir. 2017) and similar cases in support of her argument that the ALJ "failed to qualify [Nicole's] activities" and did "not provide an explanation as to how the activities he cited establish [Nicole] can perform substantial

gainful work activities on a sustained basis over the course of an eight-hour workday." Pl.'s Br. at

26, ECF No. 19. Nicole emphasizes her statements regarding her daily anxiety attacks, her inability

to leave home and go out in public, her inability to read books or recipes, her ability to make toast

or a sandwich, and her difficult vacuuming when her shoulder is symptomatic. *Id*. at 27.

Unlike in *Brown*, the ALJ pointed to more than Nicole's daily activities to discount her

subjective allegations. Beyond the activities of daily living, the ALJ noted that Nicole's allegations

about the extent of her impairments were not entirely consistent with the medical evidence, which

is more fully discussed above, as well as other evidence in the record. R. 27. Further, the ALJ may

properly rely on evidence regarding a plaintiff's routine, non-work activities in rejecting a claim

of disability.  *See Johnson v. Barnhart*, 434 F.3d 650, 659 (4th Cir. 2005).

In making these findings, the ALJ clearly considered all the available evidence, including

Nicole's statements about her symptoms, in evaluating the intensity and persistence of the Nicole's

symptoms, and the extent to which they affect her ability to work. *See* 20 C.F.R. § 404.1529. This

Court will not reweigh the evidence as it is for the ALJ to determine the facts of a particular case

and to resolve inconsistences between a claimant's alleged impairments and her ability to work.

*See Smith v. Chater*, 99 F.3d635, 638 (4th Cir. 1996); *see also Shively v. Heckler*, 739 F.2d 987,

989–90 (4th Cir. 1984) (finding that because the ALJ had the opportunity to observe the demeanor

and to determine the credibility of the claimant, the ALJ's observations concerning these questions

are to be given great weight). The ALJ's opinion regarding Nicole's subjective allegations is

comprehensive and applied the proper legal standard. Accordingly, this Court concludes that the

ALJ supports his analysis of Nicole's subjective complaints with substantial evidence.

III.   **Assessment of the ALJ's RFC Finding for a Range of Medium[7] Work with
Additional Limitations[8]**

Nicole challenges the ALJ's assessment of her mental and physical RFC. In review of the

record and the ALJ's analysis, the Court finds that substantial evidence supports the ALJ's

assessment of Nicole's mental and physical RFC.

A claimant's RFC is his or her "maximum remaining ability to do sustained work activities

in an ordinary work setting" for eight hours a day, five days a week despite his or her MDIs and

symptoms. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). It is a factual

finding "made by the [ALJ] based on all the relevant evidence in the case record," *Felton-Miller

v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011), and it should reflect specific, credibly

established "restrictions caused by medical impairments and their related symptoms" that affect

the claimant's "capacity to do work-related physical and mental activities" on that basis. SSR 96-

8p, 1996 WL 374184, at *1, *2; s*ee Mascio*, 780 F.3d at 637–40. Generally, a reviewing court will

affirm the ALJ's RFC findings and conclusions when it is clear that he considered all the relevant

evidence under the correct legal standards, *see Brown*, 873 F.3d at 268–72, and his written decision

builds an "accurate and logical bridge from that evidence to [her] conclusion." *Woods v. Berryhill*,

888 F.3d 686, 694 (4th Cir. 2018).

A.  **Mental RFC Evaluation**

Nicole argues that the ALJ failed to properly assess her mental impairments as required by

SSR 96-8P. *See* Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims, SSR

96-8P (S.S.A. July 2, 1996). Specifically, Nicole claims the ALJ failed to properly explain how

---

[7] "Medium" work involves lifting no more than fifty pounds at a time, but frequently lifting or carrying
objects weighing twenty-five pounds. 20 C.F.R. § 404.1567(b).
[8] Nicole's assignments of error II (assessment of Nicole's mental impairments under SSR 96-8p) and IV
(assessment of Nicole's physical impairments and RFC) are addressed in this section as they relate to the
ALJ's RFC finding.

his RFC findings address or accommodate her moderate limitations in concentrating, persisting, or maintaining pace and interacting with others. Pl.'s Br. 19–25. Nicole further argues that the ALJ did not address her ability to sustain work. Pl.'s Br. 21.

SSR 96-8P requires the ALJ to include a narrative discussion describing how the evidence supports his conclusions when developing the RFC. *Teague v. Astrue*, No. 1:10-cv-2767, 2011 U.S. Dist. LEXIS 153878, 2011 WL 7446754, at *8 (D.S.C. Dec. 5, 2011). The ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8P, 1996 SSR LEXIS 5, [WL] at *7; *Meadows v. Astrue*, No. 5:11-cv-63, 2012 U.S. Dist. LEXIS 115150, 2012 WL 3542536, at *8 (W.D. Va. Aug. 15, 2012) (citing *Davis v. Astrue*, No. 9-cv-2545, 2010 U.S. Dist. LEXIS 132972, 2010 WL 5237850, at *5 (D. Md. Dec. 15, 2010)).

Here, the ALJ explained why Nicole's moderate limitations in concentration, persistence, or pace and in interacting with others did not translate into a limitation in the RFC beyond that imposed. As it relates to concentration, persistence, or pace, the ALJ specifically acknowledged that Nicole complained to her treating practitioners of difficulty concentrating and completing tasks. *See* R. 22–32. However, the ALJ noted that most of Nicole's treatment notes described her as grossly alert and oriented without any obvious distractibility, lethargy, or slow thinking, speech, or movements and that her daily activities of driving, shopping online, and reading books showed some capability of maintaining concentration, persistence, and pace. *Id*. Further, the ALJ walked through several of her medical appointments noting conservative, infrequent treatment, noting that although her observed mental status has been somewhat abnormal at times, findings were normal or unremarkable in other areas, and that she regularly was able to concentrate and stay focused. R.

31

27–28. Contrary to Nicole's argument, the ALJ explained his reasoning and the RFC, including specific references to Nicole's treatment records, the medical opinion evidence, and prior administrative findings. The ALJ explained that Nicole's moderate limitations in concentration, persistence, or pace were accommodated with a restriction to simple, work-related decisions, few if any workplace changes, and a work environment free of fast-paced production requirements, such as assembly line work. R. 25.

As it relates to interacting with others, the ALJ specifically acknowledged that Nicole alleged difficulty getting along with others because she is easily agitated, she avoids situations with her family, and claims excessive fear of being outside of the home alone. R. 23. The ALJ found objective evidence existed of functional loss in this area, including an abnormal mood and affect at times. R. 21. However, the ALJ noted that her medical providers described Nicole as otherwise appropriate in her interactions with her clinicians, and without obvious abnormalities in eye contact, speech, or overall behavior. R. 23, 28. The ALJ further noted that at her most recent appointment prior to the hearing, Nicole was found to have cooperative engaging behavior, increased eye contact, appropriate affect, normal speech rate, and logical stream of thought, despite her complaints. *Id*. The ALJ also provided that Nicole was able to spend time wither mother regularly and with other family members on occasion. *Id*. Contrary to Nicole's argument, the ALJ explained his reasoning and the RFC, including specific references to the medical records and opinions. The ALJ explained that Nicole's moderate limitation in interacting with others was accommodated with a restriction of no interaction with the public and occasional interaction with coworkers.

In determining Nicole's mental RFC, the ALJ also considered the medical opinions of Drs. McClain and Leizer, and NP Nauful. R. 30–32. Overall, the ALJ found the opinions of the state

agency psychological consultants, Drs. McClain and Leizer, were partially persuasive, but different limitations were warranted by the totality of the evidence. R. 30-31. Specifically, the ALJ noted that he was imposing additional limitations based on his review of the entire record, as the agency consultants did not have the benefit of the evidence submitted by Nicole after the reconsideration determination was made. R. 31. These additional limitations included a work environment free of fast-paced production requirements, only simple, work-related decisions, few if any workplace changes, no interaction with the public, and occasional interaction with co-workers, which fully accommodated Nicole's moderate limitations, in light of her mood and anxiety symptoms. R. 31. As discussed above, the ALJ found NP Nauful's medical opinions unpersuasive as the "marked" and "extreme" limitations appeared to rely heavily on Nicole's own self-reported symptoms.

Nicole's assertion that the ALJ did not explain how the RFC findings address or accommodate her moderate limitations with concentration, persistence, or pace and with interacting with others is unfounded.[9] The ALJ provided a lengthy narrative discussion of Nicole's allegations, treatment records, and opinion evidence regarding her mental health limitations. The ALJ considered Nicole's allegations of difficulty being around people and with concentration, persistence, and pace at length in his opinion. The ALJ explained how his RFC is supported by Nicole's mental health treatment records and carefully analyzed each facet of her mental health

---

[9] Nicole argues that the ALJ failed to address her ability to sustain work over an eight-hour day. Pl.'s Br. at 25–30, ECF No. 19. The purpose of the RFC is to assess "an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis" meaning "8 hours a day, for 5 days a week, or an equivalent work schedule." *See* 20 C.F.R. §§ 404.1545(b); SSR 96-8P, 1991 SSR LEXIS 5, 1996 WL 374184 at *1-2. Here, the ALJ determined that Nicole could perform sustained work activities in an ordinary work setting on a regular and continuing basis with certain limitations and accommodations. The ALJ provided a narrative discussion explaining his conclusions and the evidence supporting the RFC determination.

impairments. Accordingly, I find that the ALJ's assessment of Nicole's mental impairments was sufficient under SSR 96-8P.

### B. Assessment of Plaintiff's Physical Impairments and RFC Findings

Nicole claims the ALJ failed to build the required logical bridge between the evidence of Nicole's physical impairments and his RFC findings. Pl.'s Br. at 30–32. Nicole further argues that the ALJ failed to properly consider her symptoms and allegations regarding her medical impairments. *Id*. at 31. Lastly, Nicole argues that the ALJ failed to make specific findings regarding whether her impairments would cause her to experience episodes of pain necessitating breaks or absences from work, how often they would occur, and the impact her ability to perform work-related activities. *Id*.

The ALJ is required to develop an adequate RFC that accounts for the work activities the claimant can perform given the physical or mental impairments affecting her ability to work. Importantly, the ALJ must explain the conclusions reached and explain any record evidence which contradicts the RFC determination. *See* SSR 96-8p, 1996 SSR LEXIS 5, 1996 WL 374184 (S.S.A. July 2, 1996); *see also Monroe*, 826 F.3d at 189 (emphasizing that an ALJ needs to provide an explicit explanation linking medical evidence listed in the decision to his ultimate findings). The ALJ is instructed to cite specific medical and non-medical evidence supporting his conclusion, discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis, describe the maximum amount of each work-related activity the individual can perform, and explain how any material inconsistencies or ambiguities in the evidence were considered and resolved. SSR 96-8p, 1996 SSR LEXIS 5, 1996 WL 374184, at *7 (S.S.A. July 2, 1996).

In *Mascio*, the Fourth Circuit rejected a "per se rule requiring remand when the ALJ does not perform an explicit function-by-function analysis," agreeing instead with the Second Circuit that "[r]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review.'" *Mascio*, 780 F.3d at 636 (citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)). The Fourth Circuit "held remand was necessary, in part, because the ALJ failed to indicate the weight given to two residual functional capacity assessments which contained relevant conflicting evidence regarding the claimant's weightlifting abilities." *Newcomb v. Colvin*, No. 2:14-CV-76, 2015 U.S. Dist. LEXIS 56212, 2015 WL 1954541, at *3 (N.D. W. Va. Apr. 29, 2015).

Here, the ALJ's decision includes the narrative discussion required by SSR 96-8p and contains sufficient information to allow this Court to engage in a meaningful review. Unlike in *Mascio*, the court is "not left to guess about how the ALJ arrived at his conclusion" because the ALJ's findings include a comprehensive analysis of Nicole's medical records, the medical opinions, the non-medical evidence, and the ALJ's conclusions. The ALJ explains how the limitations in the RFC correlate with Nicole's severe physical impairments.

As to Nicole's shoulder and neck impairments, the ALJ included a lengthy analysis regarding Nicole's complaints, the medical evidence, the non-medical evidence, and medical opinions. Specifically, the ALJ noted Nicole's complaints in July 2020, April 2021, and October 2021, the physical examinations showing shoulder and neck tenderness with palpation, and the X-ray imaging from July 2020 and October 2021 showing mainly osteoarthritic changes and very minimal anterolisthesis secondary to facet arthropathy. R. 28. The ALJ noted that Nicole's physical examinations repeatedly showed that she had full range of motion in her shoulders

without pain, normal strength and no swelling in the extremities, special tests such as liftoff and drop-arm were negative, and Nicole was neurovascularly intact in her arms. R. 29.

As to Nicole's sleep-related issues, the ALJ noted her longstanding history of insomnia treated with medications like Seroquel, Ambien, and Lunesta and her diagnosis of severe sleep apnea treated with a CPAP machine. *Id*. The ALJ considered Nicole's complaints regarding a feeling of claustrophobia and an inability to sleep while using the CPAP machine, as well as complaints of fatigue and sleepiness after a more consistent use of the CPAP machine. R. 29-30. The ALJ further noted that despite Nicole's complaints regarding her symptoms of sleepiness and fatigue, on multiple occasions she appeared objectively alert and oriented upon examination. R. 30.

As to Nicole's obesity, the ALJ considered the medical evidence that showed her body mass index ("BMI") values in the 30s. *Id*. The ALJ noted that although obesity could increase symptoms of pain and fatigue, the medical evidence showed Nicole had full range of motion and no edema or tenderness of her extremities, and no localized tenderness or swelling despite her obesity. *Id*. The ALJ also considered Nicole's hypertension, but the medical evidence did not warrant additional or greater limitations than those prescribed for Nicole's other medical impairments. R. 29.

The ALJ also reviewed the prior medical opinions of the state agency medical consultants. R. 32. The ALJ found that the medical opinion at the initial level of review was less persuasive due to a lack of evidence that was clarified at the later stages. *Id*. The ALJ also considered the medical opinion of the state agency medical consultant at the reconsideration level of review that Nicole could perform medium work and occasionally push and pull with the right upper extremity. R. 32. The ALJ found his opinion mostly persuasive as it appropriately considered the then-

available evidence regarding Nicole's symptoms, treatment, laboratory results, and physical examination findings, along with her activities of daily living, but found additional postural limitations were appropriate considering the cumulative effect of Nicole's cervical spine disorder, shoulder arthropathy, obesity, and other physical impairments (i.e., never climbing ropes, ladders, or scaffolds; frequently climbing ramps or stairs, balancing, stooping, kneeling, crouching, and crawling). *Id*.

To accommodate her impairments, the ALJ limited Nicole to medium work, occasional pushing and pulling, and reduced postural requirements (i.e., no climbing of ladders, ropes, or scaffolds, and frequent climbing of ramps or stairs, balancing, stooping, kneeling, crouching, and crawling). R. 25, 29. The ALJ found the sleep-related issues contributed to the exertional, postural, and mental limitations in the RFC finding, but did not require additional or greater limitations. R. 29-30.

In sum, the ALJ provided a detailed summary of Nicole's physical impairments, medical records, testimony and opinion evidence. The ALJ discussed Nicole's symptoms, her resulting limitations, the medical evidence, medical opinions, Nicole's testimony, her credibility and conflicting medical evidence. The ALJ was required to create a narrative discussion that builds "an accurate and logical bridge from the evidence to his conclusion," which the ALJ did in his discussion of the medical and non-medical evidence, Nicole's alleged symptoms, and the medical opinions of record. Accordingly, as the ALJ provided a thorough explanation that creates a "logical bridge" from the evidence to his conclusions, the Court finds that Nicole's physical RFC is supported by substantial evidence.

37

## CONCLUSION

For the above reasons, it is **RECOMMENDED** that an order be entered **AFFIRMING** the final decision of the Commissioner, **GRANTING** the Commissioner's Motion for Summary Judgment, ECF No. 23, **DENYING** Nicole's Motion for Summary Judgment, ECF No. 18, and **DISMISSING** this case from the court's docket.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the presiding District Judge.

The Clerk shall serve certified copies of this Report and Recommendation on all counsel of record.

Entered:  February 7, 2024

C. Kailani Memmer
United States Magistrate Judge